# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **KRISTI GASPARD** | * | **CIVIL ACTION NO. 05-0195** |
| **VERSUS** | * | **MAGISTRATE JUDGE HILL** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **BY CONSENT OF THE PARTIES** |

## REASONS FOR JUDGMENT

The undersigned was referred this social security appeal by consent of the parties. For the reasons set forth below, the Commissioner's decision is **REVERSED AND REMANDED** for further proceedings.

**I.   Background**

The claimant, Kristi Gaspard ("Gaspard"), age 26, filed applications for a period of disability, disability insurance benefits, and supplemental security income payments on the basis that she was disabled due to histiocytosis X,[1] diabetes insipidus,[2] depression, and a slipped disc in the lower lumbar spine. She was a senior

---

[1] A tissue macrophage; the class includes hepatic Kupffer cells, alveolar macrophages, giant cells of granulomas, osteoclasts, and dermal Langerhans cells. These cells derive from precursors that normally reside in bone marrow but migrate through the bloodstream to egress into tissues for final differentiation. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

[2] Chronic excretion of very large amounts of pale urine of low specific gravity, causing dehydration and extreme thirst; ordinarily results from inadequate output of pituitary antidiuretic hormone; the urine abnormalities may be mimicked as a result of excessive fluid intake, as in psychogenic polydipsia. *Id*.

in college at the University of Louisiana-Lafayette, but had dropped several classes for health reasons. She had also completed a dental assistant course. She had past work experience as a waitress, cashier, floor walker/child supervisor in a children's museum, short order cook, sales person, and dental assistant.

Claimant has a history of physical and mental impairments. On February 13, 2000, she was admitted to Charter Cypress Hospital after she had attempted an overdose. She had an extensive history of recurrent, chronic, major depression, for which she had received outpatient psychiatric treatment with medication for a number of years. Dr. James Blackburn's diagnosis was major depression, recurrent. Claimant's Global Assessment of Functioning ("GAF") scores were 25 on admission, 60 for the previous year, and 55 on discharge.

Dr. Sandra B. Durdin performed a mental status examination on November 8, 2002. She reported that claimant's breakup with her fiancé the previous year led to severe acting out, drug abuse, and suicidal attempts or gestures. However, claimant had resumed her social life and her parents made her stay active.

Dr. Durdin determined that claimant could understand and follow directions. She found that claimant had no serious memory problems, but her ability to handle details might vary according to her pain level and use of medications. She observed that while claimant's depression and substance abuse had been significant, she

2

claimed to be sober and her depression had improved with treatment. Because of claimant's chronic illnesses, Dr. Durdin noted that her functioning capacity might vary from time to time. She found that claimant was capable of work which was not unduly stressful. Her assessment was depressive disorder, NOS, moderate, and polysubstance abuse, allegedly in remission.

Simone Blackburn, LCSW, had treated claimant on a monthly basis since January 14, 1999, for major depression and anxiety. She noted that claimant had responded well to anti-depressant medication, and seemed to do much better when she took it consistently. She encouraged claimant to continue on her medications and get involved in positive activities that would increase her self-esteem.

In a Mental RFC Assessment dated February 26, 2003, Dr. Cathy Castille found that claimant was moderately limited as to her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. She also determined that claimant was moderately limited as to her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

Dr. Samir Salama, a psychiatrist, treated claimant from 2001 to 2004. On July 13, 2004, he prepared a Medical Opinion Re: Ability to Do Work-Related Activities

(Mental). He found that claimant had fair ability to maintain regular attendance and be punctual within customary, usually strict tolerances; perform at a consistent pace without an unreasonable number and length of rest periods; deal with normal work stress; deal with the stress of semiskilled and skilled work, and use public transportation. Fair was defined as "[a]bility to function in this area is seriously limited, but not precluded." (Tr. 387). Dr. Samir noted that claimant's physical health, anxiety attacks and depression could prevent her from functioning at work.

Claimant also had a complicated history of physical problems. She was diagnosed as an infant with histiocytosis-X affecting the bone, for which she was treated with chemotherapy. At age 11, she had developed diabetes insipidus secondary to histiocytosis, for which she had received low-dose pituitary radiotherapy. She continued taking medications for her diabetes.

Drs. Luis Meza and Andrew Harwood reported that claimant had been doing well until May, 2002, when she developed pain in in her left jaw and numbness in her left lower lip. Needle biopsies confirmed the presence of Langerhans cell histiocytosis in the mandible. She was treated with external beam radiotherapy for the mandible lesion, which was completely excised.

Claimant also reported low back pain in May, 2002. An MRI revealed a disc protrusion at L5-S1 pressing the anterior thecal sac. Dr. Muldowny stated that he did

4

not believe that her disc herniation was significant in terms of neural compression. He recommended physical therapy and prescribed Vicodin ES.

On July 15, 2002, claimant was doing a little bit better. The physical therapist reported about a 20% decrease in low back pain. On examination, her muscle strength was 5/5, reflexes were symmetric, and straight leg raising was negative. Dr. Muldowny opined that claimant had predominantly a mechanical back problem, with no evidence of radicular complaints. He thought it best to treat her non-operatively with physical therapy, chiropractic treatment, and Vicodin.

In a Residual Functional Capacity ("RFC") Assessment dated September 11, 2002, claimant was assessed with a light RFC. She was found to have no postural limitations, except that she could never climb ladders, ropes, and scaffolds. She was to avoid all exposure to hazards, such as machinery and heights.

Dr. Daniel L. Hodges performed EMG/NCV studies on March 18, 2003, which revealed mild right S1 changes consistent with a low grade radiculopathy. He recommended conservative treatment for her mechanical lumbar radiculitis as claimant was too young for surgery.

On May 1, 2003, Dr. Muldowny reported that claimant's MRI showed a small left paracentral disc protrusion at C3-C4 which abutted the thecal sac, but did not distort it. There was a central disc herniation at C4-C5 which did indent the thecal

sac centrally. He also noted a small left paracentral disc protrusion, which abutted the thecal sac with no evidence of clear neural impingement. The lumbar MRI showed some disc dessication and a central disc protrusion at L4-5 with no evidence of neural compression.

Dr. Muldowny reported that claimant was still having pain in her neck, shoulders, elbows, wrists, low back, hips, knees, and ankles. He stated that claimant certainly had some degenerative conditions in her neck and low back, but he was reluctant to ascribe her symptoms to these particular lesions. He did not really think that any of them were causing any significant neural compression. He noted that claimant indicated that she was unable to sit for more than 30 minutes at a time, and had to alternate positions about every half hour. He referred her to a rheumatologist.

On June 26, 2003, claimant saw rheumatologist James M. Lipstate for complaints of chronic pain, muscle and joint aches in her neck, hands, wrists, shoulders, back, hips, knees, ankles, and feet. She had a lumbar epidural steroid injection the previous week, which had exacerbated her back discomfort. She had tried a number of modalities to relieve her pain without much benefit.

Dr. Lipstate opined that claimant met the criteria for fibromyalgia. He added Neurontin to her medications and recommended changes in her sleep habits.

Dr. Lipstate report on August 28 that claimant's symptoms were exacerbated after she was involved in a car accident on August 21. He upped her Neurontin and added Mobic, cautioning her that some of these medications might cause drowsiness with activities such as driving.

On October 29, 2003, claimant was hurting diffusely. She reported that she had been feeling increasingly anxious and very depressed. Dr. Lipstate thought that at least some of claimant's symptoms were somatization syndrome related to anxiety and depression. He recommended that she follow up with Dr. Salama, and continue her regimen with the addition of Depo-Medrol IM and water therapy. Claimant reported that she had dropped her class schedule from 17 to 8 hours.

On November 20, claimant reported that she was feeling better after receiving a number of trigger point injections from Dr. Joseph Gillespie. However, she complained on December 17 that her symptoms had recurred. She was also having symptoms of restless legs.

On January 22, 2004, claimant was symptomatic in her neck, back, and multiple other trigger points. Dr. Lipstate injected two tender trigger areas. Claimant was interested in pursuing sleep studies since she had not been resting well at night.

An MRI dated February 20, 2004, showed a broad-based 6 mm central, left paracentral and posterolateral disc extrusion at L5-S1 with thecal sac effacement,

borderline central stenosis, posterior displacement of the descending left S1 nerve root, and mild left-sided foraminal narrowing.

Claimant had sleep studies performed on April 14, 2004, because of continued insomnia. She was taking Methadone for chronic pain. Dr. J. Darvin Hales reported that the Multiple Sleep Latency Test was suggestive of abnormal daytime sleepiness. Polysomnography showed abnormal sleep architecture and severe snoring.

The assessment was insomnia with poor sleep hygiene, depression, and chronic pain. Dr. Hales recommended weight reduction, avoidance of alcohol and sedatives before bed, and changing sleep patterns. He noted that claimant did not appear to be highly motivated to follow these suggestions, but they were strongly recommended.

Lumbar discography performed by Dr. John E. Cobb on July 27, 2004, revealed symptomatic disruption with degenerative disc disease and anterior column failure at L5-S1. A post-discogram CT scan showed central annular tears and central focal disc herniation at L5-S1.

On September 28, 2004, claimant was referred to Dr. Steven K. Staires for an IDET procedure.[3] She complained of posterior cervical pain, bilateral periscapular pain with referred pain into the flanks and abdomen, low back pain, bilateral groin pain, bilateral knee and ankle pain, and numbness in both hands. Her medications included Celebrex, Methadone, Lortab, Xanax, Ultram, Elavil, Soma, Wellbutrin,

---

[3]This report was submitted to the Appeals Council.

Neurontin, Cymbalta, and Crestor. Based on the testing reports, Dr. Staires determined that he could not perform the IDET procedure because the disc architecture was significantly disrupted.

At the hearing on June 29, 2004, claimant was 25 years old. She testified that she was 5 feet 4 inches tall and weighed 193 pounds, which was about 50 pounds above her normal weight. She said that she had gained weight due to the steroid injections every four weeks.

Claimant testified that she was a senior in college, majoring in English. She reported that she had scheduled full-time classes, but dropped to seven credits. She stated that she had been attending school since 1997. She said that she had been on the Dean's list, but her average had dropped to less than a 2.5.

Regarding complaints, claimant testified that she had pain all over her body, histiocytosis, arthritis, and fibromyalgia. She stated that her depression had become three or four times worse since she had relapsed. She reported that she rarely socialized because she was still having suicidal thoughts about five days a week.

Additionally, claimant reported that she had other side effects from her medications, including irritability, depression, and inability to concentrate. She stated that she was taking Methadone, as well as a topical containing Morphine, and other drugs.

9

As to activities, claimant reported that she had difficulty typing because of arthritis and swelling in her fingers and wrists. She stated that her mother did all her chores for her. Claimant was able to drive, but her mother usually dropped her off for classes.

Additionally, claimant testified that she made jewelry as a hobby, but it took a while to do it. She also typed invoices for her father's business about once a month. She said that she spent eight or nine hours a day reclining or lying down because of back pain.

Regarding restrictions, claimant testified that she could sit and walk for about 20 minutes at a time, and about 2 to 2.5 hours in an 8-hour period. She stated that she had to alternate sitting and standing. She reported that she could lift about 10 pounds.

The Administrative Law Judge ("ALJ") called vocational expert ("VE") Thomas G. Mungall to testify at the hearing. He classified claimant's past work as a cashier/checker, waitress, child supervisor at a museum, canteen operator, and sales attendant as light and unskilled, while the dental assistant job was skilled. The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience, who could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand, walk, and sit for six hours, and could not do complex work due to emotional problems. In response, Mr. Mungall testified that she

could do a pretty full range of light work, including cashier/checker, canteen operator, and museum attendant.

When the ALJ changed the hypothetical to assume a claimant who could do sedentary work with no complex work, Mr. Mungall testified that she would be able to do simple sedentary type jobs, such as cashier, sales counter clerk, and receptionist. Next, when the ALJ asked whether claimant would be able to do any work if she had to recline three-fourths of the day, the VE responded that she would not. The ALJ also asked whether claimant could work if she had problems three or four times a month where she would have to recline for a significant portion of the day, to which the VE responded, "No. Not on a sustained basis. No." (Tr. 457).

### Law and Opinion

On appeal, claimant argues that: (1) the ALJ erred in failing to find her disabled at Steps 2 and 3 when determining the severity of all of her medically determined impairments, and (2) the ALJ erred at Step 4 in assessing her RFC, resulting in an erroneous finding that she could perform her past work. Because I find that the ALJ erred in finding that claimant had the ability to maintain employment, I order that the Commissioner's decision is **REVERSED and REMANDED** for further proceedings.

In finding that claimant had the RFC to perform light work, the ALJ noted that her "ability to attend school and make good grades indicates that she has some ability to work." (Tr. 20). He also observed that Dr. Salama's opinion was consistent with the RFC assessment, because he had limited her only in regard to semiskilled and skilled work. The ALJ further relied on the DDS physician's statement of September 11, 2002, to find that her disc herniation was not significant because it was not causing any radicular symptoms or physical findings, although the ALJ acknowledged that medical records were added after this opinion was issued. These findings are erroneous.

The record reflects that while claimant had started attending school full-time, she was forced to drop several courses because of her health problems. Four professors confirmed that claimant had missed several classes due to her illnesses. (Tr. 114-117). While the ALJ noted that claimant had made "good grades," claimant testified that her GPA had dropped from Dean's List level to below a 2.5. (Tr. 430). Thus, this finding is not supported by the evidence.

The ALJ's determination that Dr. Salama's Medical Source statement was consistent with the RFC assessment is also unsupported. Dr. Salama found that claimant's ability to perform several of the described activities was "fair," which was defined as "seriously limited, but not precluded." (Tr. 387). He opined that her

12

physical health, anxiety attacks and depression "could prevent her from functioning at work." (Tr. 389). However, Dr. Salama did not answer the portion of the statement which asked for an estimate of how often claimant's impairments or treatments would cause her to be absent from work. (Tr. 390). Thus, the Court finds that this case should be remanded for this determination by Dr. Salama.

Additionally, the ALJ noted that claimant's disc herniation was not significant, as it was not causing any radicular symptoms or physical findings. (Tr. 20). However, this finding was based on an RFC assessment prepared by a DDS physician in 2002, which was before updated medical records had been received. (Tr. 205-212). A subsequent discogram performed by Dr. Cobb on July 27, 2004, reflected that claimant had "*symptomatic* disc disruption with degenerative disc disease and anterior column failure at L5-S1." (emphasis added). (Tr. 393). As this RFC assessment was not based on the updated medical records, the Court also finds that this case should be remanded for that determination.

Further, the Court notes that as of the time of the hearing, claimant was taking Methadone and Morphine. (Tr. 442). These are both narcotic medications designed for the relief of moderate-to-severe pain. Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other

13

symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). The medication which claimant was taking is absolutely consistent with her continued complaints and the objective medical evidence. The ALJ did not take the claimant's medication into consideration, and his failure to do so was error.

Claimant argues that she is unable to work on a sustained basis. A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job she finds for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). The vocational expert testified that claimant would not be able to work on a sustained basis if she had problems which required her to recline three-fourths of the day. (Tr. 457). However, none of claimant's treating physicians have indicated exactly what her work-related limitations are. Thus, I find that this matter should be remanded for further proceedings consistent with this opinion.

Accordingly, it is ordered that the Commissioner's decision is **REVERSED AND REMANDED**.\

Signed this 9th day of January, 2006, at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE